1

2

3

4

5                      UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF WASHINGTON
6                               AT SEATTLE

7   UNITED STATES OF AMERICA, ex rel., Girish
    Parikh,

8                      Plaintiff,                    No. C01-476P

9            v.                                      ORDER ON RELATOR'S MOTION
                                                    TO COMPEL TESTIMONY
10  PREMERA BLUE CROSS,                             CONCERNING MEETINGS
                                                    ATTENDED BY DEFENDANT
11                     Defendant.                   PREMERA'S MEDICARE
                                                    COMPLIANCE OFFICER
12

13

14          This matter comes before the Court on Relator's "Motion to Compel Testimony Concerning

15  Meetings Attended by Defendant Premera's Medicare Compliance Officer."[1]  (Dkt. No 103).  Relator

16  argues that Premera improperly raised attorney-client privilege objections during two depositions in

17  which the witnesses were questioned about meetings attended by Premera's Medicare Compliance

18  Officer Nabil Istafanous.  In the proposed order submitted with his motion, Relator proposes that the

19  Court find that "testimony concerning the meetings attended by Nabil Istafanous . . . are not shielded

20  from discovery by the attorney-client privilege" and order "that the depositions of Quentin Powers and

21  Pamela Hinthorne be reopened to afford Relator the opportunity to inquire concerning business

22  meetings attended by Mr. Istafanous."

23
    ───────────────
24
            [1] In his reply brief, Relator uses a different title for his motion, calling it a "Motion to Compel
25  the Production of Testimony of Nabil Istafanous."  (Dkt. No. 124).

ORDER - 1

1   After this motion was fully briefed, Relator submitted a supplemental memorandum in support

2   of the motion, which Defendant has moved to strike as untimely and irrelevant.  The Court declines to

3   strike the supplemental memorandum as untimely because it discusses materials that Relator did not

4   obtain until after briefing on this motion was completed.  However, the Court does not accord

5   significant weight to these supplemental materials, which concern attorney-client privilege assertions in

6   a different state-court case involving Premera and in a different context.

7   Having reviewed the materials submitted by the parties, the Court GRANTS in part and

8   DENIES in part Relator's motion.  At this time, the Court declines to make the broad finding

9   proposed by Relator – i.e., that "testimony concerning the meetings attended by Nabil Istafanous . . .

10  are not shielded from discovery by the attorney-client privilege."  Whether communications at

11  meetings attended by Mr. Istafanous are protected by the attorney-client privilege must be evaluated

12  on a meeting-by-meeting basis.  Premera suggests that Mr. Istafanous attended these meetings as a

13  "representative of the legal department" in connection with internal legal investigations.   However, it

14  is not clear that the Premera employees who attended these meetings were aware that the meetings

15  were conducted as part of a legal investigation or that they knew of Mr. Istafanous's role as a

16  "representative of the legal department."

17  Therefore, the Court GRANTS Relator's request to reopen the depositions of Mr. Powers and

18  Ms. Hinthorne.  At the depositions, Relator may question the witnesses to determine whether they and

19  other participants at meetings attended by Mr. Istafanous were informed: (1) that the particular

20  meetings were conducted as part of a legal investigation by Premera; and (2) that Mr. Istafanous

21  attended the meetings as a representative of the legal department.  If the witness clearly indicates that

22  the participants in a particular meeting attended by Mr. Istafanous were informed that the meeting was

23  conducted as part of a legal investigation and of Mr. Istafanous's role, Defendant may assert attorney-

24  client privilege for communications at such a meeting.  If the witness is unable to testify that attendees

25  at a particular meeting were informed that the meeting was conducted as part of a legal investigation

ORDER - 2

1    and of Mr. Istafanous's role, Defendant shall not be permitted to assert attorney-client privilege for

2    communications at such meetings and Relator may continue to question the witness regarding the

3    substance of such communications.  Defendant shall bear the costs of the reopened depositions

4    because its objections effectively prevented Relator from pursuing such questioning at the initial

5    depositions.

6         The reasons for the Court's order are set forth below.

7                                        **Background**

8         This is a False Claims Act case brought against Premera Blue Cross by Relator Girish Parikh, a

9    former Premera employee.  The pending motion concerns Premera's assertion of the attorney-client

10   privilege at two depositions in which Premera employees were questioned about meetings attended by

11   Mr. Istafanous, an attorney who serves as Premera's Vice President of Corporate Compliance and

12   Ethics.

13   A.      Pamela Hinthorne Deposition

14        Pamela Hinthorne, Premera's Medicare compliance coordinator, was deposed on April 13,

15   2006.  Relator was represented by Timothy Keller, while Defendant was represented by Kathryn

16   Bucher.  The following exchange occurred at Ms. Hinthorne's deposition in response to questions

17   regarding backlogs in Medicare Secondary Payer (MSP) claims:

18        Q (By Mr. Keller)      Do you recall attending any meetings with, for instance, Nabil where the
          backlog of MSP claims was discussed?
19
          Ms. Bucher:   Objection.  I want to say for the record, to the extent Counsel would be present
20        in any of those meetings, we're not going to discuss those meetings.

21        Mr. Keller:      Okay.

22        Ms. Bucher:   I think we need to clarify for the record, Mr. Keller, that you understand Mr.
          Istafanous, depending upon the meeting, may have been acting under the direction of counsel.
23
          Mr. Keller:      So to clarify, is it your position, Counsel, that at some meetings Mr. Istafanous
24        was acting as legal counsel?  And in other meetings, he was not?

25        Ms. Bucher:   Yes.

1    Q (By Mr. Keller)      Did Nabil ever advise you that he was acting in a legal capacity on
     behalf of Premera?
2

3    Ms. Bucher:    Let me correct my – what I just stated on the record –

     Mr. Keller:     – if you have an objection – if you have an objection, please make it.  I have a
4    question posed to the witness, and I would like her to answer.

5    * * * *

6    Ms. Bucher:    I'd like to clarify what I said.  He was not acting as counsel; he was acting
     under the direction of counsel from time to time, depending on the activity in question.  You
7    then stated in your question he was acting as counsel.  That's what I'd like clarified.

8    (Hinthorne Dep. at 172:6 - 174:1).

9    B.      Quentin Powers Deposition

10          Quentin Powers, Premera's Vice President and General Auditor, was deposed on April 10,

11   2006.  During his deposition, Relator's counsel showed Mr. Powers a document marked as Exhibit 7.

12   Counsel represented that Relator created this document, which was titled "Minutes of Meetings

13   Related to Medicare Part A."  The document describes twelve meetings attended by Relator between

14   October 27, 1999 and June 12, 2000, including meetings where Mr. Istafanous was listed as an

15   attendee.

16          In response to questions concerning meetings that included Mr. Istafanous, Premera's counsel

17   asserted attorney-client privilege, stating:

18          We have determined that sometime in mid-September of 1999, Mr. Istafanous was appointed
            an agent of the Legal Department and participated in these meetings for the purpose of
19          identifying legal risks and determining appropriate actions based on the concerns that [Relator]
            was raising.  And based upon that, I am going to assert attorney-client privilege and instruct
20          the witness not to answer as to the substance of meetings involving Mr. Istafanous.

21   (Powers Dep. at 184:20 - 185:4).  Relator's counsel then asked, "just to make sure I understand, you

22   are instructing the witness not to respond to any questions relating to meetings appearing on Plaintiff's

23   Exhibit 7 in which Nabil was an attendee; is that correct?"  Id. at 186:6-10.  Premera's counsel

24   responded:

25

ORDER - 4

1
2
3

> I'm instructing him not to answer as to the substance of anything that was communicated in those meetings. There could be a question you could ask him about whether he recalls attending a meeting and who else attended, but as to the substance of the meeting, what was communicated in those meetings, that is correct, based on my understanding of Mr. Istafanous's role.

4    Id. at 186:11-19.

5    C.    Premera's Contentions Regarding Mr. Istafanous's Roles

6    Premera contends that Mr. Istafanous had "dual roles" at Premera and that he sometimes acted

7    as a representative of the company's legal department for legal investigations. First, Premera asserts

8    that "[b]eginning in early fall 1999, Premera commenced an internal legal investigation of Premera's

9    Medicare Part A Audit and Reimbursement operations," which Premera refers to as the "AR

10   Investigation." (Opp. at 2). Premera asserts that the law firm Crowell & Moring, as well as Price

11   Waterhouse Coopers (PwC), were engaged to assist in the investigation. In his declaration, Mr.

12   Istafanous states that "[i]n September 1999, John Domeika, Premera's then Vice President and

13   General Counsel, appointed me as a representative of Premera's legal department for purposes of the

14   AR Investigation" and that "[i]n that role, I served as the principal legal contact at Premera for

15   Crowell & Morning and PwC." (Istafanous Decl., ¶ 3). Premera has not offered any documents from

16   September 1999 that reflect the nature or scope of this assignment, such as a memo or e-mail from

17   Mr. Domeika to Mr. Istafanous.

18   Mr. Istafanous further asserts:

19
20
21
22
23

> From on or about the fall of 1999 into 2002, I was invited to meetings the contents of which potentially impacted the AR Investigation with, among others, Plaintiff Girish Parikh, Janet Russell, Premera's former Director of Medicare Part A, Pamela Hinthorne, Premera's former Medicare Part A Compliance Coordinator, and Quentin Powers, Vice President of Internal Audit. Some of these meetings are reflected in Mr. Parikh's notes . . . . I attended several of the meetings reflected [in Mr. Parikh's notes], each time collecting information as a representative of the legal department in order to report any additional information obtained from meeting attendees that could influence the legal advice ultimately rendered for the AR Investigation.

24   Id. ¶ 8.

25

ORDER - 5

1  Premera also maintains that "[i]ndependently, in the fall of 1999, Premera's executive

2  management requested that Premera's legal department provide legal advice concerning the possible

3  transfer of Premera's Medicare Part A Unit to a successor fiscal intermediary." (Opp. at 3).  Premera

4  states that Crowell & Moring and PwC were again engaged "to assess Premera's possible exposure to

5  litigation or other liability in connection with the anticipated exit, which by mid-2000 included an

6  assessment of certain aspects of Premera's Medicare Secondary Payer (MSP) operations." Id.

7  Premera refers to this as the "Exit Investigation."  Premera asserts that Mr. Istafanous was again

8  appointed by Mr. Domeika as a "representative of the legal department" for the "Exit Investigation,"

9  although Premera has not produced any documents from Mr. Domeika to Mr. Istafanous that describe

10  this assignment or Mr. Istafanous's role.  Mr. Istafanous asserts that "[d]uring the Exit Investigation, I

11  assisted outside counsel, the legal department, and PwC in gathering information and analyzing

12  aspects of, among other departments, the MSP operations."  (Istafanous Decl. ¶ 4).

13  Mr. Istafanous states in his declaration that:

14  Beginning in the fall of 2000 and throughout the Exit Investigation, I attended meetings about Premera's inventory of undeveloped, *potential* MSP claims.  First, I would have attended such

15  meetings as part of the Exit Investigation as a representative of the legal department.  Second, this issue may have been addressed at meetings as part of preparing for the applicable year's

16  annual Internal Control Certification required by CMS [the Centers for Medicare and Medicaid Services].  I do not have a specific recollection of meeting with Ms. Hinthorne about

17  Premera's inventory of undeveloped, *potential* MSP claims, but if I did, it would have been in the context of the Internal Control Certification meetings, at which Premera's legal counsel

18  was almost always present and providing legal advice.

19  Id. ¶ 11 (emphasis in original).

20  Relator notes that Janet Russell, Premera's Director of Medicare/Federal programs, testified at

21  her deposition that she was not advised that Mr. Istafanous's actions were on behalf of the legal

22  department.  Ms. Hinthorne also testified that Mr. Istafanous did not tell her that he was attending

23  meetings on behalf of the legal department, although she indicated that she had been informed by

24  another person that either "Kitty [legal counsel] or Nabil needed to be present" at meetings "to assist

25

ORDER - 6

in the discussions and the decisions" and that "it was a known rule, if you will, at these meetings that if

legal was not present, that Nabil would be there." (Hinthorne Dep. at 174:18 - 175:16).

Premera attempts to explain any confusion about Mr. Istafanous's role as follows:

> Because Premera was careful to limit knowledge of the separate ongoing investigations, it is not surprising that there may have been some confusion about the role Mr. Istafanous played in any particular meeting. Although Mr. Istafanous did not explain his role in each meeting he attended, participants in meetings with Mr. Istafanous were made aware, generally, of confidential legal investigations pertaining to Audit and Reimbursement and MSP on which Mr. Powers[2] was working as an arm of the legal department.

(Opp. at 12) (internal citations omitted).

In terms of which Premera employees were allegedly informed of Mr. Istafanous's role as a

"representative of the legal department" in the AR and Exit Investigations, Mr. Istafanous states:

> I believe I informed Mr. Parikh and Ms. Russell that I had been appointed as a representative of the legal department for the AR Investigation and, as such, all communications concerning this investigation were attorney-client privileged. I believe Mr. Powers and Ms. Hinthorne understood the same. I also believe I informed Mr. Powers and Ms. Russell that I had been appointed as a representative of the legal department for the Exit Investigation; however, initially, I explained that the purpose of that investigation was a routine audit of MSP operations. I believe that Ms. Hinthorne may have been informed of that fact.

(Istafanous Decl. ¶ 9). Premera has not offered any declarations from Ms. Russell, Mr. Powers, or

Ms. Hinthorne regarding what they were told by Mr. Istafanous. However, Relator also has not

offered a declaration disputing Mr. Istafanous's contention that Relator was informed that Mr.

Istafanous had been appointed as a representative of the legal department for the AR Investigation and

that "all communications concerning the investigation were attorney-client privileged."

Although Premera has asserted attorney-client privilege for some meetings attended by Mr.

Istafanous, Relator notes that Premera has divulged communications involving other meetings that Mr.

Istafanous attended, including communications at a May 2002 meeting that involved Mr. Istafanous

and Mr. Powers, as well as Premera's general counsel John Domeika. However, Premera asserts that

communications at that meeting were not privileged because "[n]either Mr. Domeika nor Mr.

---

[2] Presumably, this is a typographical error and Premera meant "Mr. Istafanous."

ORDER - 7

1  Istafanous offered legal advice during this business meeting, nor were they conducting or reporting on

2  the subject of the privileged investigations or any other legal matter." (Opp. at 6).

3  **Analysis**

4  As the party asserting the attorney-client privilege, Premera bears the burden of establishing all

5  elements of the privilege. United States v. Martin, 278 F.3d 988, 999-1000 (9th Cir. 2002). Analysis

6  of attorney-privilege issues is often complicated when an attorney plays dual roles within a

7  corporation. As one court has observed:

8  > Because in-house counsel may play a dual role of legal advisor and business advisor, the
   > [attorney-client] privilege will apply only if the communication's primary purpose is to gain or
9  > provide legal assistance. Business communications are not protected merely because they are
   > directed to an attorney, and communications at meetings attended or directed by attorneys are
10 > not automatically privileged as a result of the attorney's presence. Rather, the corporation
   > must clearly demonstrate that the communication in question was made for the express
11 > purpose of securing legal not business advice.

12 Kramer v. Raymond Corp., 1992 WL 122856 at *2 (E.D. Pa. May 29, 1992) (internal citations and

13 quotations omitted); see also In re Sealed Case, 737 F.2d 94, 99 (D.C. Cir. 1984) (party asserting

14 attorney-client privilege for communications by in-house attorney who had duties outside the

15 "lawyer's sphere" must make a "clear showing" that attorney was acting in a "professional legal

16 capacity").

17 Here, Relator challenges Premera's assertion of attorney-client privilege in response to: (1)

18 questions at Ms. Hinthorne's deposition on whether she attended meetings with Mr. Istafanous where

19 a "backlog of MSP claims" was discussed; and (2) questions at Mr. Powers' deposition regarding the

20 meetings listed in a document prepared by Relator. Premera does not maintain that Mr. Istafanous

21 provided legal advice at any particular meeting. Instead, Premera asserts that "[r]egardless of whether

22 Mr. Istafanous provided legal advice during the meetings, his purpose in attending was to serve as the

23 legal department's representative and to report back on developments relevant to the ongoing

24 investigations." (Opp. at 9). Premera maintains that "investigations by attorneys for the purpose of

25

1    developing informed legal advice . . . are protected" and that "[t]he communications at issue here are

2    protected investigatory activities." Id. at 8.

3           Premera's argument is based largely on Upjohn Co. v. United States, 449 U.S. 383 (1981). In

4    Upjohn, a pharmaceutical company conducted an internal investigation of questionable payments to

5    foreign governments.  Upjohn's attorneys prepared a letter containing a questionnaire that was sent to

6    all foreign general and area managers over the signature of the company's chairman, which indicated

7    that the chairman had asked Upjohn's general counsel "to conduct an investigation for the purpose of

8    determining the nature and magnitude of any payments made by the Upjohn Company or any of its

9    subsidiaries to any employee or official of a foreign government." Id. at 387.  The questionnaire

10   sought detailed information concerning such payments.  The company's general counsel and outside

11   counsel interviewed the recipients of the questionnaire, as well as 33 other Upjohn employees, as part

12   of the investigation.  In a subsequent IRS investigation regarding the tax consequences of the

13   payments, the government demanded production of the questionnaires, as well as notes of interviews

14   conducted with Upjohn's employees.  Upjohn declined to produce these documents, citing attorney-

15   client privilege.

16          The Supreme Court held that the attorney-client privilege protected the questionnaires and

17   notes from disclosure.  The Court noted that "[t]he communications at issue were made by Upjohn

18   employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to

19   secure legal advice from counsel." Id. at 394.  The Court observed that "the employees themselves

20   were sufficiently aware that they were being questioned in order that the corporation could obtain

21   legal advice" and that steps had been taken to ensure that "even those interviewees not receiving a

22   questionnaire were aware of the legal implications of the interviews." Id. at 394-95.

23          Premera also relies on United States v. Rowe, 96 F.3d 1294 (9th Cir. 1996), a case in which

24   two associates at a law firm were assigned by the firm's senior partner to investigate possible

25   irregularities regarding another partner's handling of client funds.  The court held that the senior

ORDER - 9

1    partner's conversations with the associates were protected by the attorney-client privilege.  The court

2    indicated that "[t]he attorney-client privilege can exist only after a client consults an attorney 'for the

3    purpose of facilitating the rendition of professional legal services.'"  Id. at 1296 (internal citation

4    omitted).  Following Upjohn, the court indicated that "fact-finding which pertains to legal advice

5    counts as 'professional legal services.'"  Id. at 1297.

6         Premera is correct that under Upjohn and Rowe, a corporation may invoke the attorney-client

7    privilege to shield communications made by the corporation's employees to an attorney in connection

8    with an internal legal investigation.  However, it is not clear from the record that Mr. Powers or Ms.

9    Hinthorne were actually aware that any particular meeting attended by Mr. Istafanous was conducted

10   as part of an internal legal investigation by Premera or that they were aware of his role as a

11   "representative of the legal department."

12        Premera argues that Relator has not offered any authority holding that a witness's "knowledge

13   of a lawyer's legal role is determinative in whether the privilege applies to investigatory activities."

14   (Opp. at 12).  However, Upjohn plainly suggests that in order for the privilege to apply, an employee

15   must be aware that the communication to counsel is being made to enable the corporation to obtain

16   legal advice.  The Upjohn Court specifically noted that "the employees themselves were sufficiently

17   aware that they were being questioned in order that the corporation could obtain legal advice" and

18   "even those interviewees not receiving a questionnaire were aware of the legal implications of the

19   interviews."  449 U.S. at 394-95.  As the Ninth Circuit noted in Admiral Insurance Co. v. U.S. District

20   Court for the District of Arizona, 881 F.2d 1486, 1492 (9th Cir. 1989), the Upjohn Court "held that

21   the privilege applies to communications by any corporate employee regardless of position when the

22   communications concern matters within the scope of the employee's corporate duties and the

23   employee is aware that the information is being furnished to enable the attorney to provide legal advice

24   to the corporation." (emphasis added); see also Clavo v. Zarrabian, 2003 WL 24272641 at *1 (C.D.

25   Cal. Sept. 24, 2003) (noting "[b]ecause internal company investigations are often an important part of

a lawyer's legal services to a client, the attorney-client privilege extends to any employee communicating on matters within the scope of his or her employment <u>when that employee is aware</u> that he or she is being questioned in confidence in order for his or her employer to obtain legal advice") (emphasis added).

Here, Mr. Istafanous has offered a declaration describing what he believes Mr. Powers and Ms. Hinthorne knew or understood regarding his role in these meetings.  However, Premera has not offered similar declarations from Mr. Powers or Ms. Hinthorne.  It is also unclear whether other attendees at such meetings were informed of Mr. Istafanous's role as a "representative of the legal department" or that the meetings were conducted as part of an ongoing legal investigation.  Unlike <u>Upjohn</u>, where the corporation clearly stated in a letter to its managers that the company's chairman had asked its general counsel to conduct an investigation, (<u>Upjohn</u>, 449 U.S. at 387), Premera has not pointed to any written communications that informed Mr. Powers, Ms. Hinthorne, or any other Premera employee about the "AR Investigation," the "Exit Investigation," or Mr. Istafanous's role in the investigations.

Premera has offered little basis for the Court to find that Mr. Powers, Ms. Hinthorne, or any other person who attended meetings with Mr. Istafanous were sufficiently aware that the meetings were conducted as part of the "AR Investigation" or the "Exit Investigation."   Mr. Istafanous's declaration tends to raise more questions than it answers.  For example, Mr. Istafanous does not indicate when he believes that Mr. Powers, Ms. Hinthorne, and others were informed about the investigations and his role in the investigations, nor does he indicate how such information was conveyed.  In addition, with respect to the "Exit Investigation," Mr. Istafanous states that "initially, I explained that the purpose of that investigation was a routine audit of MSP operations," a statement that appears to suggest that at least some Premera employees were initially misled as to the purpose of the investigation.  (Istafanous Decl. ¶ 9).

1    At this time, the Court cannot find that Premera has met its burden of demonstrating that the

2    attorney-client privilege protects communications made at any particular meeting that Mr. Istafanous

3    attended.  Therefore, the Court will permit Relator to reopen the depositions of Mr. Powers and Ms.

4    Hinthorne.  At the depositions, Relator may question the witnesses to determine whether they and

5    other participants at meetings attended by Mr. Istafanous were informed: (1) that the particular

6    meetings were conducted as part of a legal investigation by Premera; and (2) that Mr. Istafanous

7    attended the meetings as a representative of the legal department.  If the witness clearly indicates that

8    the participants in a particular meeting attended by Mr. Istafanous were informed that the meeting was

9    conducted as part of a legal investigation and of Mr. Istafanous's role, Defendant may assert attorney-

10   client privilege for communications at such a meeting.  If the witness is unable to testify that attendees

11   at a particular meeting were informed that the meeting was conducted as part of a legal investigation

12   and of Mr. Istafanous's role, Defendant shall not be permitted to assert attorney-client privilege for

13   communications at such meetings and Relator may continue to question the witness regarding the

14   substance of such communications.

15   Defendant shall bear the costs of the reopened depositions (e.g., court reporter fees) because

16   its objections effectively prevented Relator from pursuing these questions during the initial

17   depositions.  However, Defendant shall not be responsible for paying Relator's attorney's fees in

18   connection with the reopened depositions.

19                                                        **Conclusion**

20   Consistent with the discussion above, Relator's motion is GRANTED in part and DENIED in

21   part.  The Court declines at this time to make the broad finding that none of the communications at

22   meetings attended by Mr. Istafanous are protected by the attorney-client privilege.  However, Relator

23   will be permitted to reopen the depositions of Mr. Powers and Ms. Hinthorne, with Defendant to bear

24   the costs of the reopened depositions.

25   //

ORDER - 12

1    The Clerk is directed to send copies of this order to all counsel of record.

2    Dated: December 15, 2006

3
                                        s/Marsha J. Pechman
4                                       Marsha J. Pechman
                                        United States District Judge
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ORDER - 13